**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

**OLEG ZHIRIAKOV,**

**Petitioner,**

**v.**                                        **CASE NO.  20-3141-JWL**

**WILLIAM BARR, et al.,**

**Respondents.**

**<u>MEMORANDUM AND ORDER</u>**

This matter is a petition for writ of habeas corpus filed under 28 U.S.C. § 2241. Petitioner is detained at the Chase County Jail in Cottonwood Falls, Kansas ("CCJ"), under the authority of the Enforcement and Removal Office ("ERO"), Immigration and Customs Enforcement ("ICE"), a sub agency of the U.S. Department of Homeland Security ("DHS"). Petitioner raises four grounds for relief:  1) that his mandatory detention violates procedural due process in light of his viable legal defenses to removal; 2) his prolonged detention violates procedural due process; 3) his detention is in violation of substantive due process under the Fifth Amendment; and 4) he is being subjected to unconstitutional conditions of confinement due to the COVID-19 pandemic.  Petitioner seeks immediate release or a bond hearing before an Immigration Judge within 15 days to consider release on bond or conditional parole. (Doc. 1, at 22.)

**I.  Background**

Petitioner is a native and citizen of Russia.  Declaration of Deportation Officer Katy A. Casselle, ¶ 5, (Doc. 4–1) (hereinafter "Casselle Decl.").  Petitioner first entered the United States on March 11, 2013, at the Miami International Airport with a valid B2 Visitor's Visa and permission to remain in the United States for a period of time not to exceed September 10, 2013.

Casselle Decl., ¶ 6.  Petitioner also entered the United States in late 2013, 2016, and 2017, each time with a valid B2 Visitor's Visa and permission to remain in the United States for a limited period of time.  Casselle Decl., ¶¶ 8–12.

On September 17, 2018, Petitioner's spouse, a U.S. citizen, filed a Petition for Alien Relative (Form I-130) with U.S. Citizenship and Immigration Services ("USCIS"), and Petitioner filed an Application to Register Permanent Residence or Adjust Status (Form I-485), an Application for Travel Document (Form I-131), and an Application for Employment Authorization (Form I-765) with USCIS. Casselle Decl., ¶¶ 13-14.[1]  On February 21, 2019, USCIS granted Petitioner Advanced Parole into the United States, issuing a form I-512, valid until February 20, 2020, which allowed Petitioner to travel outside of the U.S. without the risk that his pending applications for certain immigration benefits or re-entry into the U.S. would be denied as a result of his departure.  Casselle Decl., ¶ 15.  Petitioner departed the United States in July 2019.  Casselle Decl., ¶ 16.

On August 1, 2019, Petitioner arrived at the Chicago O'Hare International Airport, bearing a valid Russian passport and the I-512 Advanced Parole Document and seeking admission into the United States. Casselle Decl., ¶ 17. An officer with Customs and Border Protection ("CBP") referred the Petitioner to Passport Control Secondary to process the Advanced Parole, and during the secondary interview a cell phone inspection revealed text messages indicating Petitioner's marriage was fraudulent as he paid his spouse to enter into and remain in the marriage in order to obtain lawful permanent resident status in the United States. Casselle Decl., ¶¶ 17–18.  Upon completion of the interview and cell phone inspection, the Petitioner was found to be inadmissible into the United States pursuant to 8 U.S.C.

---

[1] On October 7, 2019, USCIS denied both the I-130 petition submitted on behalf of Petitioner and Petitioner's I-485 application. Casselle Decl., ¶ 27.

§ 1182(a)(6)(C)(i).[2]  Casselle Decl., ¶ 19.

***Removal Proceedings***

On or about August 1, 2019, Petitioner was issued a Notice to Appear ("NTA", Form I-862), placing him in removal proceedings before the Immigration Judge under 8 U.S.C. § 1229a. Casselle Decl., ¶ 20.  The Petitioner was also issued a Warrant of Arrest (Form I-200) and a Notice of Custody Determination (Form I-286).  Casselle Decl., ¶ 20.  CBP determined Petitioner to be an arriving alien and detained him without bond pursuant to 8 U.S.C § 1225(b)(2)(A).  Casselle Decl., ¶ 20.  On August 2, 2019, ERO took custody of Petitioner and placed him in the McHenry County Jail, Woodstock, Illinois.  Casselle Decl., ¶ 22.  On August 9, 2019, Petitioner was issued a superseding NTA containing the same charge and setting forth the date and time of Petitioner's initial hearing before the Chicago Immigration Court. Casselle Decl., ¶ 23.

On or about August 23, 2019, the NTA was filed by the ICE Office of the Principal Legal Advisor ("OPLA") with the Chicago Immigration Court and removal proceedings began. Casselle Decl., ¶ 24.  Petitioner appeared before the Immigration Judge on September 13, 2019, and the Immigration Court scheduled the matter for a hearing on September 19, 2019.  Casselle Decl., ¶ 25. At the September 19, 2019 hearing, Petitioner admitted the allegations contained in the NTA and the Immigration Judge sustained the charge of inadmissibility.  Casselle Decl., ¶ 26. The Immigration Court scheduled a merits hearing for October 28, 2019, to consider Petitioner's application for relief.  Casselle Decl., ¶ 26.

On October 28, 2019, Petitioner appeared before the Immigration Judge for a merits hearing on his application for relief.  Casselle Decl., ¶ 28.  At the conclusion of the hearing, the

---

[2]  Section 1182(a)(6)(C)(i) provides that "[a]ny alien who, by fraud or willfully misrepresenting a material fact, seeks to procure (or has sought to procure or has procured) a visa, other documentation, or admission into the United States or other benefit provided under this chapter is inadmissible."  8 U.S.C. § 1182(a)(6)(C)(i).

Immigration Judge issued a decision denying Petitioner's application for relief and ordered him removed to Russia. Casselle Decl., ¶ 28.  On or about November 15, 2019, Petitioner filed an appeal with the Board of Immigration Appeals ("BIA").  Casselle Decl., ¶ 29. The BIA dismissed Petitioner's appeal on April 17, 2020.  Casselle Decl., ¶ 32.

***Post-Removal Proceedings***

On April 24, 2020, a Warrant of Removal/Deportation (Form I-205) was issued.  Casselle Decl., ¶ 33.  ERO began the process of applying for a travel document for the Petitioner on April 27, 2020.  Casselle Decl., ¶ 34.  Petitioner initially notified ERO that he would not complete the application for a travel document, but after communication between ERO and Petitioner's immigration attorney, Petitioner submitted a completed travel document application to ERO on or about May 15, 2020.  Casselle Decl., ¶¶ 34–36.

On May 15, 2020, Petitioner was served with a Warning for Failure to Depart (Form I-229(a)) and a Notice to Alien for File Custody Review, indicating that his custody status will be reviewed on or about July 16, 2020.[3]  Casselle Decl., ¶ 37.

On May 18, 2020, ERO emailed a travel document request packet to ICE Removal and International Operations for review.  Casselle Decl., ¶ 38.  On June 9, 2020, ERO sent a travel document request packet to the Consulate General of the Russian Federation. Casselle Decl., ¶ 39.

***Petitioner's Medical Status and ERO actions***

On April 8, 2020, Petitioner was transferred by ERO to the CCJ.  Casselle Decl., ¶ 31.

---

[3] At or near 90 days post a removal order, if an alien has not been removed, ERO conducts a File Custody Review, to determine if there is a significant likelihood of removal in the reasonably foreseeable future, or if an alien should be released from ICE custody. Casselle Decl., ¶ 37. During the File Custody Review, an alien can submit any evidence that would support the alien's argument for release from ICE custody.  Casselle Decl., ¶ 37.  ERO provides an alien with a Notice to Alien for File Custody Review so the alien is aware of the process for review and has sufficient time to submit any documentation they wish to submit.  Casselle Decl., ¶ 37.

Petitioner's transfer took place as a precautionary measure for detainees at higher risk for COVID-19, where such detainees were transferred to jails with available bed space and which were projected to be less at risk for COVID-19.  Casselle Decl., ¶ 31.

Shortly thereafter, on April 10, 2020, ICE ERO issued COVID-19 pandemic response requirements ("PRR").  Casselle Decl., ¶ 40.  The PRR sets forth expectations and assists ICE detention facility operators to sustain detention operations, while also mitigating risk from COVID-19.  Casselle Decl., ¶ 40.  As part of this dynamic guidance, ERO's Assistant Director of Field Operations, Peter Berg, issued expanded guidance directing the ERO field offices to review the custody of subgroups of detainees to determine whether the alien's COVID-19 risk outweighed continued detention. Casselle Decl., ¶ 40. The delineated subgroups included: (1) pregnant detainees or those who have delivered within the prior two-weeks; (2) detainees over 60 years old; and (3) detainees having any chronic illness that may make them immune-compromised, including but not limited to, blood disorders, chronic kidney disease, compromised immune systems, endocrine disorders, metabolic disorders, heart disease, lung disease, and/or neurological or neurodevelopmental disorders.  Casselle Decl., ¶ 40.

When booked into ICE facilities, ICE detainees are screened by medical personnel. Casselle Decl., ¶ 41. During Petitioner's medical screenings, it was verified that Petitioner has hypertension and diabetes and is taking medication for these conditions. Casselle Decl., ¶ 41. Petitioner was subsequently seen for an initial mental health evaluation on May 28, 2020, and while he currently does not have a mental health diagnosis, he has been referred for further evaluation.  Casselle Decl., ¶ 41.  Petitioner has not indicated any other medical concerns to ICE. Casselle Decl., ¶ 41.

ICE understands that Petitioner is housed in a unit at the CCJ that is designated as a chronic care unit. Casselle Decl., ¶ 41. This unit is a standard housing unit that houses aliens with similar health problems (i.e. diabetic, blood pressure, cholesterol, etc.).  Casselle Decl., ¶ 41.  ICE also understands that while aliens in this unit have no contact with aliens from other housing units, they still have the same access to facilities such as telephones, legal materials, and televisions as other inmates housed at the CCJ.  Casselle Decl., ¶ 41.

ERO is aware of the decision in *Fraihat et. al. v. U.S. Immigration and Customs Enforcement, et al.,* __ F.Supp.3d__, 2020 WL 1932570 (C.D. Cal. Apr. 20, 2020) ("*Fraihat*"). Casselle Decl., ¶ 42.  ICE has taken steps to review cases that fall within that class action and continues to do so. Casselle Decl., ¶ 42.  On April 28, 2020, ERO reviewed Petitioner's case under *Fraihat.* Casselle Decl., ¶ 43.  ERO reviewed Petitioner's medical and immigration history, and declined to release Petitioner under *Fraihat* because Petitioner is subject to a final order of removal and is within the 90-day removal period.  Casselle Decl., ¶ 43.

### Conditions at the CCJ

The CCJ has an Intergovernmental Services Agreement ("IGSA") with ICE ERO, and has housed immigration detainees since 2008.  Declaration of Chase County Jail Administrator Larry Sigler, ¶ 9, (Doc. 4–2) (hereinafter "Sigler Decl.").  The CCJ is a detention facility located in Chase County, Kansas, capable of housing 150 inmates.  Sigler Decl., ¶ 8.  As of June 10, 2020, the CCJ houses 74 inmates, which represents approximately 49.33% of the CCJ's capacity. Sigler Decl., ¶ 8.  The number of inmates housed at the CCJ has been reduced since April 15, 2020, in an effort to limit inmate population due to the COVID-19 pandemic, and it is not anticipated that the inmate population will increase significantly in the foreseeable future.  Sigler Decl., ¶ 8.  The CCJ has reduced the number of other counties from which it accepts inmates and

now only accepts inmates from Morris County, Kansas, in addition to those inmates from Chase County.  Sigler Decl., ¶ 11.  Of the 74 inmates currently housed at the CCJ, 69 are immigration detainees and 5 are county inmates.  Sigler Decl., ¶ 10.

As of June 8, 2020, the State of Kansas has reported 10,650 cases of COVID-19 in the state, resulting in 236 deaths.[4]  Sigler Decl., ¶ 4.  As of that date, Chase County has seen only three positive cases of COVID-19 within the county—all recovered—which equates to a case rate of 1.13 cases per 1,000 people.  Sigler Decl., ¶ 6–7.  The CCJ has implemented numerous and substantial precautions to protect inmates from the COVID-19 pandemic.

Beginning March 20, 2020, the CCJ adapted its procedures to limit the risk of COVID-19 exposure to inmates.  Sigler Decl., ¶ 12.  The CCJ has been closed to the public and all inmate visitation privileges have been suspended since March 19, 2020.[5]  Sigler Decl., ¶ 13.  All inmate court appearances occur remotely via video from within a courtroom located in the CCJ, in an effort to limit contact between inmates and people outside of the facility, and the courtroom is cleaned and sanitized between dockets.  Sigler Decl., ¶ 14.  The only people who enter the CCJ, other than CCJ staff members, are ICE agents bringing in detainees or emergency maintenance workers, if necessary.  Sigler Decl., ¶ 15.  The ICE agents and emergency workers are temperature checked upon entry to the building and wear masks at all times.  Sigler Decl., ¶ 15.

The CCJ employs approximately 30 staff members, including correctional officers, medical staff, and kitchen staff.  Each staff member receives a medical screening conducted by medical personnel upon arrival at the CCJ.  Sigler Decl., ¶ 16.  The screening includes a

---

[4] The website for the Kansas Department of Health and Environment shows the following state totals as of July 10, 2020:  18,611 cases; 1,304 hospitalizations; 284 statewide deaths; and 199,168 negative tests.  The website reflects five total cases in Chase County as of that date.  See https://www.coronavirus.kdheks.gov/160/COVID-19-in-Kansas (last visited July 10, 2020).

[5] Visitation may resume in the coming weeks, and while details are still under review, only no-contact visitation will be allowed and any visitors will be separated from inmates via a glass wall. *Id.*

temperature check and questioning, consistent with CDC guidelines, to determine whether the employee displays any signs or symptoms of COVID-19.  Sigler Decl., ¶ 16.  If an employee has a temperature of 100° or higher or shows any other signs or symptoms of COVID-19, the employee will be sent home to quarantine and all medical staff and inmates who have been in close contact with the potentially positive employee will continue to be screened.  Sigler Decl., ¶ 16.  Staff members wear masks at all times when in contact with inmates regardless of the length of time of the contact, and also wear masks when in confined areas with other staff members.  Sigler Decl., ¶ 17.  Staff members have been educated regarding the signs and symptoms of COVID-19 and the importance of disinfecting communal spaces.  Sigler Decl., ¶ 17.  As of June 10, 2020, no CCJ staff member or inmate has tested positive for COVID-19.  Sigler Decl., ¶ 18.

The CCJ is divided into one open dorm that houses up to 20 inmates, eight pods that each house up to 16 inmates, one pod that houses up to four inmates, and five segregated cells that each house up to two inmates.  Sigler Decl., ¶ 19.[6]  Petitioner is currently housed in C Pod.  Sigler Decl., ¶ 39.

Restrooms and showers are located within the separated spaces and are not shared between inmates housed in different pods.  Sigler Decl., ¶ 19.  Meals are served to inmates in their dorm or pod and no communal cafeteria is used.  Sigler Decl., ¶ 19.  The only facilities used by inmates outside of their pods are the recreation yard and the courtroom.  Sigler Decl., ¶ 20.  Inmates of one pod do not use the recreation yard or the courtroom at the same time as inmates from another pod, and the areas are disinfected before and after access by members of different pods.  Sigler Decl., ¶ 20.

---

[6] As noted above, the CCJ is currently operating at approximately 49% capacity with only 74 inmates.

Beginning March 20, 2020, in response to the COVID-19 pandemic, the CCJ started a 14-day cohorting procedure for new inmates.[7]  Sigler Decl., ¶ 21.  When inmates arrive at the CCJ, instead of being housed with existing inmates, as was the procedure prior to the COVID-19 pandemic, the group of new inmates is cohorted for at least 14 days.  Sigler Decl., ¶ 22.  If 14 days pass without any inmate in the cohort showing symptoms of COVID-19, the inmates are removed from the cohort and housed with other inmates outside of the cohort.  Sigler Decl., ¶ 22.  If one person in a cohort shows symptoms of COVID-19, the person will be removed from the cohort and placed in a segregated cell and the remaining cohort will remain isolated until 14 days pass without any inmate showing symptoms of COVID-19.  Sigler Decl., ¶ 22.  Two of the nine pods at the CCJ are currently reserved for cohorting.  Sigler Decl., ¶ 22.  The last inmate to arrive at the CCJ prior to initiation of the cohorting procedure arrived on March 10, 2020, and was placed in a pod on March 14, 2020.  Sigler Decl., ¶ 24.  In addition to screenings for COVID-19, each new inmate receives a full physical within the 14-day cohorting period.  Sigler Decl., ¶ 23.

In the event an inmate within Petitioner's pod shows signs or symptoms of COVID-19, the inmate will be removed from the pod and placed in a segregated cell.  Sigler Decl., ¶ 25.  The inmate will then be tested for COVID-19 and, if the results are positive, will remain separated from the other inmates until the inmate no longer poses a risk of infecting others.  Sigler Decl., ¶ 25.  The remaining members of the pod will be continually screened for signs and symptoms of COVID-19.  Sigler Decl., ¶ 25.  In the event the number of confirmed cases exceeds the number of segregated spaces available in the CCJ, ICE will be notified promptly so that inmates may be transferred to other facilities.  Sigler Decl., ¶ 26.

---

[7] Cohorting refers to the practice of isolating inmates as a group to minimize interaction of individuals who may be infected or may have been exposed to COVID-19 from non-infected individuals.

The Chase County Health Department has indicated COVID-19 tests are available and the CCJ has had no problem obtaining testing for the one employee and three inmates that have been tested.  Sigler Decl., ¶ 27.

Medical staff at the CCJ consists of a registered nurse on duty from 7:00 a.m. to 3:00 p.m., Monday through Friday, and on call 24/7, a certified medical assistant on duty on the weekends, and a doctor on call daily until 10:30 p.m.  Sigler Decl., ¶ 28.  Medical staff visit each pod at least once a day to provide medication and care and to respond to any questions or health concerns of inmates.  Sigler Decl., ¶ 29.  Opportunity for open dialog with medical staff is available at these times, and an inmate need not make a special request to discuss questions or concerns.  Sigler Decl., ¶ 29.  Medical care is also available to inmates upon request, and inmates are encouraged to seek medical care if they fall ill.  Sigler Decl., ¶ 29.

Because Petitioner is housed in C Pod—the Pod where inmates with medical conditions are housed—Petitioner receives additional medical monitoring.  Sigler Decl., ¶ 39.  Inmates in C Pod are closely monitored by medical staff and screened daily for COVID-19, in addition to regular monitoring of other health conditions and medicine rounds. Sigler Decl., ¶ 39. The daily screening includes questioning, consistent with CDC guidelines, to determine whether the inmate displays any signs or symptoms of COVID-19.  Sigler Decl., ¶ 39.  Should an inmate present with a sign or symptom of COVID-19, more in-depth screening will occur to determine the need for segregation and testing.  Sigler Decl., ¶ 39.  Further, due to his medical conditions, Petitioner has his blood pressure measured twice daily, and overall, his blood pressure has been within the normal range. Sigler Decl., ¶ 42.

Notices furnished by ICE and printed from the CDC website in English and Spanish were posted in each pod on March 20, 2020.   Sigler Decl., ¶ 30.   The notices provide

recommendations to help prevent the spread of respiratory diseases like COVID-19 and guidance on how inmates can protect themselves from COVID-19.  Sigler Decl., ¶ 30.  These notices include information about the importance of hand-washing and hand hygiene, avoiding close contact with other people, covering coughs and sneezes with a tissue instead of hands, avoiding touching the eyes, nose, and mouth, and disinfecting commonly used surfaces.  Sigler Decl., ¶ 30.  The notices also provide education regarding the symptoms of COVID-19 and encourage anyone showing the signs to seek medical attention.  Sigler Decl., ¶ 30.  Copies of these notices were provided to Petitioner in Russian.  Sigler Decl., ¶ 30.

All inmates at the CCJ are provided with soap and shampoo twice weekly and encouraged to clean themselves daily.  Sigler Decl., ¶ 31.  Petitioner has unlimited access to the shower facilities in his pod, except during nighttime lockdown.  Sigler Decl., ¶ 31.  In the event an inmate runs out of personal cleaning products before the next scheduled distribution, the inmate need only request additional cleaning products by filling out an Inmate Communication Request form and handing it to the correction officer on duty.  Sigler Decl., ¶ 32.

In addition to personal cleaning products, the CCJ also provides a cleaning cart in each pod, which contains disinfectant, spray bottles, mops, rags, and paper towels for inmates to clean their cells and other surfaces in the pod as desired.  Sigler Decl., ¶ 35.  If the cleaning cart runs out of supplies, an inmate need only push a button to notify the correction officer on duty and the supply will be replenished.  Sigler Decl., ¶ 35.  The CCJ was well-stocked in cleaning supplies prior to the COVID-19 pandemic and has not faced a shortage of cleaning supplies as a result of COVID-19.  Sigler Decl., ¶ 36.  Personal clothing is changed and laundered daily, uniforms are changed and laundered three times per week, and bedding is laundered once per week.  Sigler Decl., ¶ 37.

Inmate Communication & Request Forms are available for inmates to communicate with corrections officers and medical staff. Sigler Decl., ¶ 38. The form directs the inmate to circle one of the following types of communication: Appeal, Request, Medical, Attorney Call, Grievance, Law Library, or Property Release, and provides places for the inmate to further describe the purpose of the request, as well as a place for the responding officer to write a response. Sigler Decl., ¶ 38. These forms can be used by inmates to request additional cleaning supplies, request medical attention or care, or convey grievances regarding the condition of the pods, inadequate supplies, or inadequate medical attention. Sigler Decl., ¶ 38.

The CCJ is familiar with all applicable COVID-19 related guidance, including the *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities,* issued by the CDC, and is committed to taking all reasonable steps to ensure the health and safety of all inmates at the CCJ. Sigler Decl., ¶¶ 44-45; Ex. 3 to Sigler Decl. The CCJ also has reviewed the April 10, 2020 ICE ERO guidance to detention facilities. Sigler Decl., ¶ 40. In compliance with the guidance, CCJ staff has identified all detainees meeting the CDC's identified populations potentially being at higher risk for serious illness from COVID-19 and ensured both the ERO Field Office Director and Field Medical Coordinator have knowledge of these detainees and their medical needs. Sigler Decl., ¶ 41.

During Petitioner's physical conducted within the first 14 days of Petitioner's arrival, the CCJ confirmed Petitioner's conditions of diabetes and hypertension. Sigler Decl., ¶ 43. The CCJ has been in contact with all necessary ICE contacts to confirm ICE/ERO has knowledge of Petitioner's medical conditions. Sigler Decl., ¶ 42. Petitioner has not presented with any secondary problems relating to his diabetes, and has not presented with colorectal bleeding or

any cholesterol issues. Sigler Decl., ¶ 43.  Petitioner is also not "severely obese," but weighs approximately 210 pounds and is approximately 6 feet 4 inches tall. Sigler Decl., ¶ 43.

## II. Discussion

To obtain habeas corpus relief, a petitioner must demonstrate that "[h]e is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2241(c)(3). The federal district courts have habeas corpus jurisdiction to consider the statutory and constitutional grounds for immigration detention that are unrelated to a final order of removal. *Demore v. Kim*, 538 U.S. 510, 517–18 (2003).

Petitioner raises four grounds for relief.  First, Petitioner argues that Respondents have abrogated their duty to provide for Petitioner's health and safety due to the COVID-19 pandemic, warranting his immediate release.  Petitioner also argues that his prolonged detention without a bond hearing violates procedural due process.  He also argues that his detention violates procedural due process because he has viable defenses to removal.  Lastly, Petitioner asserts a substantive due process violation, alleging that there is no reasonable relation between his detention and a government interest.

## A.  Risk to Petitioner's Health and Safety

Petitioner argues that his continued detention threatens his safety and well-being amid the global pandemic of COVID-19.  Petitioner is 46 years old and alleges that he has a "lengthy history of smoking" as well as underlying health conditions, including obesity and colorectal bleeding. (Doc. 1, at 14).  Petitioner alleges that he suffers from diabetes, high blood pressure, and high cholesterol.  *Id*. at 14, 25.  Petitioner also claims that he has "contracted mental issues and he is prescribed psychotropic medication."  *Id*. at 14.

The Court recognizes that some courts have found that an argument regarding the conditions posed by COVID-19 must be brought in a civil rights action, while others have found that it is properly raised in a habeas petition. *See, e.g., Aguayo v. Martinez*, Civil Action No. 1:20-cv-00825-DDD-KMT, 2020 WL 2395638, *2 (D. Colo. May 12, 2020) (finding that the court lacked jurisdiction over request for immediate release based on COVID-19 because "a conditions-of-confinement claim cannot be asserted in a petition for habeas corpus under binding Tenth Circuit precedent") (citing *Palma-Salazar v. Davis*, 677 F.3d 1031, 1035 (10th Cir. 2012)); *Archilla v. Witte*, No. 4:20-cv-00596-RDP-JHE, 2020 WL 2513648, at *19 (N.D. Ala. May 15, 2020) (noting that petitioners, who are seeking release from ICE custody due to the COVID-19 outbreak, are trying to shoehorn a conditions-of-confinement claim under section 2241); *cf. Ruderman v. Kolitwenzew*, Case No. 20-cv-2082, 2020 WL 2449758, at *7 (C.D. Ill. May 12, 2020) (finding that "[c]ourts across the country addressing similar claims of civil immigration detainees during the COVID-19 pandemic have found that such a claim can proceed in a habeas corpus petition) (collecting cases).  However, the Court finds that even considering Petitioner's arguments for immediate release due to the conditions posed by COVID-19, Petitioner has not shown that his immediate release is warranted in this case.

Even if Petitioner's claim could properly be considered in a habeas petition, Petitioner has not shown that the CCJ failed to take adequate steps to ensure Petitioner's health and safety in light of the COVID-19 pandemic.  Although Petitioner has underlying health conditions that place him at a higher risk, the Court is not persuaded that the conditions at the CCJ warrant Petitioner's immediate release.  Petitioner argues that his continued confinement in ICE detention centers where COVID-19 is present without adequate protection violates due process. (Doc. 1, at 18.)  Petitioner alleges in his Traverse that "there is at least one person at the facility

who currently is infected with COVID-19 and who still shares the toiletry with everyone in the dorm." (Doc. 6, at 4.) Petitioner provides no factual support for this allegation. There is no evidence that COVID-19 is present at the CCJ. There are no reported positive cases at the CCJ, and only five cases have been reported in all of Chase County—at least three of whom have recovered. While courts have ordered immediate release or have ordered that extra precautions be taken, in this case it appears that the CCJ is taking appropriate precautions. *See, e.g., Thakker v. Doll*, No. 1:20-cv-480, ___ F. Supp. 3d ___, 2020 WL 2025384 (M.D. Pa. April 27, 2020) (where immigration detainees each suffered from chronic medical conditions and faced an increased risk of death or serious injury if exposed to COVID-19, continuation of release was granted for three detainees at facility that already had 40 confirmed cases of the virus, and was denied for seven detainees who had committed violent offenses or were being held in facilities without any known cases of COVID-19, or facilities with enhanced prevention measures).

In his Traverse, Petitioner argues that the conditions of confinement at the CCJ are unconstitutional. (Doc. 6, at 8.) Petitioner argues that he has been denied a Russian interpreter on three occasions, he is isolated from the Russian population at the CCJ, he has been denied access to medical care, he is being retaliated against for filing his habeas action, he has witnessed noncompliance with CDC protocols, he has been subjected to neglect and discrimination after filing his habeas action, his Bible was taken away, his medical care has been delayed, and he is being provided less food at meals in retaliation for filing his habeas action. (Doc. 6, at 2–4, 7.) These claims relate to Petitioner's conditions of confinement and are not properly brought in a habeas petition. A habeas petitioner may challenge the fact or duration of his confinement and may seek release or a shorter period of confinement. *See Palma-Salazar v. Davis*, 677 F.3d 1031, 1037 n.2 (10th Cir. 2012). Claims challenging a prisoner's conditions of confinement do

not arise under Section 2241.  *See McIntosh v. United States Parole Comm'n*, 115 F.3d 809, 811–12 (10th Cir. 1997) (contrasting suits under Section 2241 and conditions of confinement claims).

## B. Due Process

Petitioner argues that his mandatory detention under 18 U.S.C. § 1226(c) violates due process.  The government has pointed out that Petitioner is no longer detained under § 1226(c) because his case is in the post-removal stage.  Petitioner responds in his Traverse that he still has until July 17, 2020, to file a motion to reopen his immigration proceedings with the BIA and still has the right to reopen his removal proceedings with the Immigration Court, even after the motion to reopen is denied by the BIA.  (Doc. 6, at 2.)

Under 8 U.S.C. § 1226, the Attorney General may arrest and detain an alien pending a determination of whether the alien is to be removed from the United States.  Detention during this "pre-removal period" is considered definite because it terminates upon the immigration court's removal decision.  *Demore v. Kim*, 538 U.S. 510, 529 (2003).

Upon the entry of a final removal order, the matter enters the "removal period," and the statutory authority for detention shifts to 8 U.S.C. § 1231.  Under § 1231, the removal period begins on the latest of:  (1) the date the order of removal becomes administratively final; (2) if the removal order is judicially reviewed, and the court orders a stay of removal, the date of the court's final order; or (3) if the alien is detained or confined (except under an immigration process), the date the alien is released from detention or confinement.  8 U.S.C. § 1231(a)(1)(B). An order of removal is administratively final upon "a determination by the Board of Immigration Appeals affirming such order."  8 U.S.C. § 1101(a)(47)(B)(i); *see also* 8 C.F.R. § 1241.1(a) ("An order of removal made by the immigration judge at the conclusion of proceedings under section

240 of the Act shall become final; (a) Upon dismissal of an appeal by the Board of Immigration Appeals."); *see also Forde v. Atty. Gen.*, 257 F. App'x 167, 169 (11th Cir. 2007) ("The finality of a removal order is not affected by the filing of a motion to reopen or reconsider.") (citing *Stone v. INS*, 514 U.S. 386, 405 (1995)).

After an order of removal becomes administratively final, the Attorney General "shall detain the alien" during the 90-day removal period established under 8 U.S.C. § 1231(a)(2). *See Zadvydas v. Davis*, 533 U.S. 678, 683 (2001) and *Morales-Fernandez v. INS*, 418 F.3d 1116, 1123 (10th Cir. 2005). Generally, the government is required to remove the alien held in its custody within the 90-day removal period. *See* 8 U.S.C. § 1231(a)(1)(A)–(B).

While the government may detain an "inadmissible" or criminal alien beyond the statutory removal period, *see* 8 U.S.C. § 1231(a)(6),[8] the government may not detain such an alien indefinitely. *Zadvydas*, 533 U.S. at 699. Instead, the detention of an alien subject to a final order of removal for up to six months is presumptively reasonable in view of the time required to accomplish removal. *Id*. at 701. Beyond that period, if the alien shows that there is "no significant likelihood of removal in the reasonably foreseeable future, the Government must respond with evidence sufficient to rebut that showing." *Id*. Furthermore, as the period of detention grows, "what counts as the 'reasonably foreseeable future' conversely would have to shrink." *Id*. The six-month presumption does not mean that every alien must be released after that time, but rather an alien may be detained "until it has been determined that there is no significant likelihood of removal in the reasonably foreseeable future." *Id*.

---

[8] Section 1231(a)(6) provides that:

An alien ordered removed who is inadmissible under section 1182 of this title, removable under section 1227(a)(1)(C), 1227(a)(2), or 1227(a)(4) of this title or who has been determined by the Attorney General to be a risk to the community or unlikely to comply with the order of removal, may be detained beyond the removal period and, if released, shall be subject to terms of supervision in paragraph (3).

The order for Petitioner's removal became administratively final on April 17, 2020, when the BIA dismissed his appeal of the removal order.[9]  Petitioner has not been detained in excess of the presumptively reasonable six-month period.  Even after the expiration of the six-month period, he would still have to show that there is no significant likelihood of removal within the reasonably foreseeable future.  Furthermore, Petitioner is still being detained within the 90-day period in which the Attorney General "shall detain the alien."  8 U.S.C. § 1231(a)(2).  *See Shixin Lu v. Adducci*, No. 15-cv-11448, 2015 WL 3948920, *4 (E.D. Mich. June 29, 2015) (finding that where petitioner had not been in custody for six months following her removal order, the court lacked authority to hear petitioner's claims, regardless of the merits of her argument that she is not a flight risk, and that she should be granted asylum or that she should be released pending the resolution of her motion to reopen in front of the BIA).

Petitioner has not shown that his post-removal detention is unreasonable or unconstitutional.  Petitioner has failed to show that "[h]e is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2241(c)(3).

**IT IS THEREFORE ORDERED BY THE COURT** that the petition is **denied.**

**IT IS SO ORDERED**.

**Dated July 13, 2020, in Kansas City, Kansas.**

**S/ John W. Lungstrum**
**JOHN W. LUNGSTRUM**
**UNITED STATES DISTRICT JUDGE**

---

[9] Petitioner failed to seek judicial relief within the 30-day deadline for appeals.  *See* 8 U.S.C. § 1252(b)(1) ("The petition for review must be filed not later than 30 days after the date of the final order of removal.")

18